MGD

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Troy Darin Zimmerman,

    Plaintiff,

v.

Pima County Sheriff's Department, et al.,

    Defendants.

No.  CV 16-00753-TUC-RM

**ORDER**

Plaintiff Troy Darin Zimmerman, who is currently confined in the Arizona State Prison Complex-Lewis, brought this civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 1.)  Defendant Hedrick moves for summary judgment, and Plaintiff opposes.[1] (Docs. 37, 40.)

The Court will grant the Motion and terminate this action.

**I.**    **Background**

On screening of Plaintiff's Complaint under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated a Fourth Amendment excessive force claim against Pima

---

[1] Plaintiff was informed of his rights and obligations to respond to Defendant Hedrick's Cross-Motion for Summary Judgment pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc).  (Doc. 39.)

County Sheriff's Department Officer K.W. Hedrick and directed Hedrick to answer.[2] (Doc. 8.) The Court dismissed the remaining Defendants. (*Id*.)

Plaintiff alleged, in relevant part, that following the execution of a search warrant at Plaintiff's residence, officers ordered Plaintiff to crawl to the front door on his stomach, which Plaintiff did. (Doc. 1 at 5-6.) Although Plaintiff was unarmed, compliant, and wearing only boxer shorts, when Plaintiff reached the front door, Hedrick grabbed Plaintiff and dragged him down the driveway, and Plaintiff suffered "uncomfortable scrapes to his knee and genital area." (*Id*. at 5.) The dragging also caused Plaintiff's boxer shorts to come down and expose his genitals, causing Plaintiff humiliation, mental anguish, embarrassment, and suffering. (*Id*. at 5-6.) Afterwards, Hedrick put Plaintiff in overly tight hand restraints even though Plaintiff was told there was no arrest warrant yet. (*Id*. at 6.)

Defendant moves for summary judgment on the basis that the force used to move Plaintiff from the doorway to the safety zone was not excessive and he is entitled to qualified immunity. (Doc. 37.)

**II.   Legal Standards**

    **A.   Summary Judgment**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d

---

[2] Plaintiff spelled Defendant's name "Hendrick" in his Complaint but the Court will use the spelling provided by Defendant.

1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

**B.    Fourth Amendment**

"Inherent in [the] authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." *Muehler v. Mena*, 544 U.S. 93, 98-99 (2005) (citing *Michigan v. Summers*, 452 U.S. 692, 705 (1981); *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  Whether the manner of detention is reasonable is determined by the particular circumstances in the case.  *See id.* at 99-100 (use of handcuffs reasonable in detaining occupant where warrant authorized a search for weapons and a wanted gang member).  Officers have a valid interest in reducing the risk of harm to officers and occupants by "routinely exercis[ing] unquestioned command of the situation" and in preventing occupants from fleeing during execution of the search warrant.  *Summers*, 452 U.S. at 702-03.

The reasonableness inquiry requires the court to balance "the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests at stake." *Muehler*, 544 U.S. at 108 (quoting *Graham*, 490 U.S. at 396). In *Muehler*, the Supreme Court approved of the district court's instruction to the jury to take into consideration such factors as "the severity of the suspected crime, whether the person being detained is the subject of the investigation, whether such person poses an immediate threat to the security of the police or others or to the ability of the police to conduct the search, and whether such person is actively resisting arrest or attempting to flee." *Id*. "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. However, "even where some force is justified, the amount actually used may be excessive." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).

At the summary judgment stage, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question of whether or not an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007).

**III.   Facts**[3]

On July 14, 2015, Defendant was part of the Pima Regional Special Weapons and Tactics (SWAT) unit "that assisted in serving a high-risk warrant at 3151 East Monte

---

[3] The relevant facts are taken from Defendant's Statement of Facts (Doc. 38) and Plaintiff's Affidavit in support of his Response (Doc. 43 at 4-5). Plaintiff only disputed two of Defendant's facts and those disputes relate to whether or not Plaintiff was standing or on the ground when Defendant first encountered him. (*See* Doc. 43 at 1-2 ¶¶ 7, 10.)

- 4 -

1 Vis[t]a, Tucson." (Doc. 38 (Def.'s Statement of Facts) ¶ 1.) Defendant attended a risk-assessment briefing before the execution of the search warrant where he was informed that Plaintiff, who lived at the residence, "was a suspect in a burglary where several guns had been stolen" and that Plaintiff's "violence and weapons history [] included an arrest for being armed in a stolen car and threatening to shoot the reporting party." (*Id*. ¶¶ 2-4, citing Doc. 22-2 (Hedrick Aff.) ¶ 4, Doc. 22-3 (Murphy Aff.) ¶ 3, and Doc. 22-3 at 6-7 (risk assessment documents).)

A Pima Regional SWAT Pre Deployment Risk Assessment prepared by Sergeant E. Thompson #1036 states that Plaintiff and his girlfriend lived at 3151 E. Monte Vista Drive, that fingerprints connected Plaintiff to two separate burglaries, and that Plaintiff and his girlfriend had pawned items later identified by a victim as items stolen in one of the burglaries. (Doc. 22-3 at 6.) The Risk Assessment further states that a car matching the description of one owned by the girlfriend was seen on video surveillance as being used during the sale of stolen items at pawn shops and that probable cause existed to arrest Plaintiff and his girlfriend. (*Id*.) The report states that Plaintiff was "also an investigative lead" in a burglary where several guns were stolen; that Plaintiff had "an extensive history [of violence] including an[] AGG Assault in 2010" in which Plaintiff and another man "were armed in a stolen car and threatened to shoot the RP"; and from 2005-2009, "as a juvenile, [Plaintiff] ha[d] numerous contacts ranging from trespass, to arson, to burglary, and an allegation of rape." (*Id*.)

The SWAT unit concluded that the threat potential at the residence was high because of the possibility of weapons. (Doc. 38 ¶ 5; Doc. 22-3 at 4 ¶ 9 (Aff. of Lt. James Murphy).) As the unit approached the residence, they identified themselves and told the occupants to open the front door. (Doc. 38 ¶ 6.) They directed a "male occupant" (Plaintiff) to crawl to the front door, which he did. (*Id*.) Once Plaintiff reached the front door, Defendant told him to lie on the ground and Defendant began to pull Plaintiff out of

the doorway.[4] (*Id.* ¶ 7.) After pulling Plaintiff about five feet out of the doorway, Defendant noticed that Plaintiff's boxer shorts were coming down so he stood Plaintiff up and escorted him to the safety zone behind an armored vehicle. (Doc. 22-2 at 3 (Hedrick Aff.) ¶ 8.) Defendant handcuffed Plaintiff and stayed with him until the end of the SWAT call when Defendant turned Plaintiff over to the burglary unit, no more than fourteen minutes later. (Doc. 38 ¶¶ 12, 14.)

Plaintiff states in an affidavit that he awoke that evening to an extremely loud siren and heard banging and yelling at his front door. (Doc. 43 at 4.) Plaintiff ran to the door and opened it and immediately backed up a few steps with his hands raised in the air. (*Id.*) Multiple officers in full armor tactical gear had rifles pointed at Plaintiff and yelled at him to get on the ground or they would shoot him. (*Id.*) Plaintiff laid on the ground and they told him to use his elbows to crawl to the door. (*Id.*) When Plaintiff reached the door, he was yanked up to a standing position, and officers yelled, "suspect is in custody." (*Id.*) Plaintiff "was shuffled through members of the entry team" until Defendant Hedrick took possession of him. (*Id.*) Hedrick shoved Plaintiff back to the ground and began to drag Plaintiff down the driveway. (*Id.*) The front side of Plaintiff's body was scraped along the ground and his boxer shorts were pulled down by the friction. (*Id.* at 5.) After a few yards, Hedrick noticed and yanked Plaintiff up and pulled his shorts up to cover his exposed genitals. (*Id.*) Hedrick then ran Plaintiff the rest of the way to the armored vehicle, dusted some dirt off Plaintiff's chest, and placed Plaintiff in handcuffs that were extremely tight. (*Id.*)

Defendant explains that he had Plaintiff lay on the ground while he pulled him out of the doorway for several reasons: (1) it is safest for the officers because it makes it more difficult for the person to run or make sudden moves; (2) "it reduces exposure to the open doorway, allows the officer to clear the doorway quickly, and avoids handcuffing

---

[4] Plaintiff states that he disputes paragraph 7 but he does not say what he specifically disputes. (Doc. 43 at 1 ¶ 7, citing Doc. 12, Ex. A (Doc. 12-1 at 2-8) (police incident reports).)

- 6 -

someone while standing in an open doorway"; and (3) "it avoids obstructing other SWAT team members' ability to see and cover the open doorway."[5] (Doc. 38 ¶ 10.)

Two Tactical Emergency Medical Support medics were at the scene and did not note any injuries to Plaintiff. (Doc. 38 ¶¶ 15, 17.) One medic asked the four individuals who had been brought out of the residence if they needed medical attention, but "none was needed." (*Id*. ¶ 18.) None of the SWAT photographs taken of Plaintiff at the scene "showed any visible injury." (*Id*. ¶ 20.) When Plaintiff arrived at the Pima County Adult Detention Center, he was interviewed by an emergency medical technician and examined that afternoon by a registered nurse; the medical records show Plaintiff "had no major or minor injuries, including abrasions, wounds, lacerations, or bruising." (*Id*. ¶¶ 21-22.)

## IV.  Analysis

### A.  Parties' Contentions

Defendant argues that the force he used was reasonable because he placed Plaintiff in a prone position just long enough to move him less than the length of an armored vehicle and into a more secure area. (Doc. 37 at 5.) Even taking as true Plaintiff's claim that he was "dragged," Defendant argues the photographic evidence showed "no visible redness, scrapes, marks, or other injuries," and "the lack of injury is confirmed by [Plaintiff's] failure to report any injuries to medical personnel on scene or at the jail." (*Id*. at 5-6.) Defendant contends that a reasonable fact finder "would have to apply its common sense to know that unreasonable dragging would leave marks on the skin." (*Id*.) Defendant further asserts that Plaintiff cannot dispute the legitimate safety reasons for placing him in a prone position for a short distance in a manner that did not cause any visible injury. (*Id*. at 7.)

---

[5] Plaintiff states that he partially disputes Defendant's paragraph 10 because he was already in a prone position using his elbows and feet to crawl while lying flat on the ground. (Doc. 43 at 2 ¶ 10.) Plaintiff asserts that Defendant "could only make the plaintiff lay back on the ground if he was stood up in a position causing the defendant [sic] to go back to the ground." (*Id*.)

Plaintiff responds that he was unarmed, in his underwear, not under arrest, vastly outnumbered by a SWAT team, and neither resisting nor attempting to flee, which makes laying him on the ground to pull him to the safety zone "not acceptable in any society." (Doc. 40 at 3.)  Plaintiff asserts that Defendant tries to minimize the humiliation and embarrassment he suffered by saying "well there was no physical damage visible," but Plaintiff argues that "[t]here are multiple cases where awards were affirmed by emotional distress/mental anguish." (*Id.*, citing *Hale v. Fish*, 899 F.2d 390, 403-04 (5th Cir. 1990); *Sevigny v. Dicksey*, 846 F.2d 953, 959 (4th Cir. 1988); *Konczak v. Tyrell*, 60 F.2d 13, 17 (7th Cir. 1979).)

### B.     Reasonableness of Force

Defendant has presented evidence that Plaintiff was a suspect in two residential burglaries, was an investigative lead in a burglary in which guns were stolen, and had a history of violence. (Doc. 22-3 at 6.)  The Pima Regional SWAT Pre Deployment Risk Assessment said probable cause existed to arrest Plaintiff and his girlfriend.  (*Id.*)  Defendant has also presented evidence as to why it was safer to have Plaintiff lay down and be pulled out of the doorway and that he only pulled Plaintiff five feet before standing him up and pulling up Plaintiff's boxer shorts. (Doc. 38 ¶ 10; Doc. 22-2 at 3 ¶ 8.)  Plaintiff does not dispute these facts or evidence.  The only fact Plaintiff disputes is whether he was already on the ground when he encountered Defendant or whether he was standing and Defendant made him get back down on the ground.  That dispute is immaterial to whether Defendant engaged in excessive force.

Believing Plaintiff's evidence and drawing all inferences in Plaintiff's favor, the record evidence supports that the nature and quality of the intrusion—dragging Plaintiff a short way, which caused his boxer shorts to be pulled down, and handcuffing him—does not outweigh the government's interest in reducing the risk of harm to the officers or others in the area.  In addition, the only evidence Plaintiff presents of possible injury is his Affidavit statement that the front side of his body "was scraped along the ground." Plaintiff does not say in his Affidavit if the scraping damaged his skin or caused pain, and

Defendant has presented evidence that Plaintiff was not physically injured.  (*See* Doc. 38 ¶¶ 15, 17-18, 20-22.)  Nor has Plaintiff shown that he ever complained to anyone that he was injured or that that the handcuffs were too tight.  Plaintiff does allege in his Complaint that he was embarrassed and humiliated (Doc. 1 at 5-6), but that alone is insufficient to create a genuine issue of material whether the force used by Defendant was reasonable under the circumstances.

Under these circumstances, it was objectively reasonable for Defendant to drag Plaintiff a short way to secure the scene and prevent Plaintiff from fleeing or harming the officers or bystanders present.  Accordingly, Defendant did not violate Plaintiff's Fourth Amendment rights and the Court will grant Defendant's Motion for Summary Judgment.

### C. Qualified Immunity

> The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.  [Federal courts] do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.  Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.

*Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal citations and quotation marks omitted).  The relevant question is whether, under the specific context of the case, the defendant's *particular* conduct violates clearly established law; "[s]uch specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."  *Id.* (citation and internal quotation marks omitted).

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that Defendant is entitled to qualified immunity.  Here, Defendant confronted Plaintiff during the execution of a high-risk search warrant involving the theft of firearms.  Prior to

executing the search warrant, Defendant was informed that Plaintiff has a history of violence, including offenses involving firearms. Defendant encountered Plaintiff in the doorway of an unsecured residence, which implicates safety concerns for officers. The dispositive inquiry is whether, against this backdrop, Defendant violated clearly established law by dragging Plaintiff several feet. The answer must be "no"; given the context surrounding Defendant's use of force, there was no clearly established right so beyond debate "that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014).

**IT IS ORDERED** that Defendant Hedrick's Motion for Summary Judgment (Doc. 37) is **granted** and this action is terminated with prejudice. The Clerk of Court must enter judgment accordingly.

Dated this 25th day of May, 2018.

_____
Honorable Rosemary Márquez
United States District Judge